IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-21-314-RAW |
| ) | |
| BRENDA BURDUE SAVAGE, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

The Defendant Brenda Burdue Savage has been charged by way of indictment with: (i) second degree murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151, & 1152; (ii) use, carry, brandish, and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A); and (iii) causing the death of a person in the course of a violation of Title 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1). The Defendant has filed two motions a *Jackson-Denno*[1] hearing and a taint hearing in this case, asserting that statements and evidence should be suppressed and/or the indictment should be dismissed. *See* Docket Nos. 30, 37. The Court referred the Defendant's motions for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See* Docket Nos. 31 & 41. The undersigned Magistrate Judge granted the request for a *Jackson v. Denno* hearing and taint hearing, which was conducted on Monday, November 15, 2021 in conjunction with the suppression hearing. *See* Docket No. 64. For the reasons set forth

---

[1] 378 U.S. 368 (1964).

below, the undersigned Magistrate Judge recommends that the Defendant's Motion for *Jackson-Denno* Hearing [Docket No. 30] and Defendant's Motion Conduct Taint Hearing and Dismiss Indictment or in the Alternative Suppress Testimony of Law Enforcement and Collected Evidence [Docket No. 37] be DENIED, except as to the requests for hearings.

## Background

The events surrounding this case occurred in the early morning hours of January 30, 2019, in McAlester, Oklahoma. McAlester Police Department officers responded to the report of an accidental shooting at 709 S. Elm in McAlester. The home was later determined to be owned by Mr. Patrick Dunlap. The response of the officers is largely reviewable from body camera videos worn by various responding officers, although one officer's body camera purportedly malfunctioned, and the officers would periodically turn the microphone off at certain points.[2] As revealed by testimony at the suppression hearing and the body camera videos produced to the Court following the hearing, the following events occurred. Officer Danny McHenry was the first officer on the scene, and his body camera shows the property as he approached, knocked on a door, and walked around to another side of the house. *See* Gov't Hr'g Ex. 1. As he came around the side of the house, he encountered two men and a woman standing outside, appearing visibly intoxicated. The two men have been identified as Patrick Dunlap and Truman Kenieutubbe. Additionally, the woman, who has now been identified as the Defendant, had a beer bottle in her hand.

---

[2] It appears that while Defendants have been in possession of video evidence from two officers (Officer McHenry and Officer Eli Hass) for quite some time, two other body camera records (from Officer Shawn Delana and Officer Robert Young) were only made available to the Defendant the week prior to this suppression hearing.

As Officer McHenry made his way toward them, one of the men pointed at the Defendant, saying "Her." While he was talking, the Defendant said, "I shot the motherf@%#!4r. I shot him. I shot him." The male then said, "He needs an ambulance," at which point the Defendant laughed and said, "No he doesn't. He's dead." Officer McHenry then stated, "Nobody leave. Nobody leave. Stay right here." *Id.* The Defendant was handcuffed shortly thereafter. Officer Eli Hass attempted to escort her to a law enforcement vehicle, but she fell, so he got assistance with moving her to and placing her in the vehicle. *See* Def. Ex. 1. Captain Gregory Read testified at the suppression hearing that Mr. Dunlap and Mr. Kenieutubbe were not separated that evening, and Mr. Dunlap went in and out of his house several times while officers were on the scene.

      While Officer Eli Hass was removing the Defendant with the help of another officer, Officer McHenry proceeded inside the house and discovered Bart Jameson lying on the floor of the living room of the house. The body camera footage showed that Mr. Jameson was nonresponsive and covered in blood, and Officer McHenry suspected that he might be deceased. Emergency Services was called to the house, and they took Mr. Jameson to the hospital where he was eventually declared deceased.

      At the scene, Officers McHenry, Eli Hass, Shawn Delana, and Captain Gregory Read were all wearing body cameras. Captain Read testified at the suppression hearing that his body camera malfunctioned that evening and he tried for two weeks to retrieve the footage from that evening but was ultimately unable to do so and his body camera had to be replaced. Additionally, Detective Don Hass was on the scene and testified at the

suppression hearing as the lead investigator. However, he was in plain clothes and not wearing a body camera. The Court is in possession of body camera footage from the other three Officers – McHenry, Eli Hass, and Delana. *See* Gov't Ex. 1 & Def. Exs. 1-4. At various times when officers were speaking to each other but still present on the scene, Officer McHenry and Officer Eli Hass muted the microphone on their body cameras while the camera still recorded. *See* Gov't Ex. 1 & Def. Exs. 1-3. They testified that they generally did so for conversations between fellow officers, although Officer McHenry testified that he sometimes forgot to turn the microphone back on after the conversations were concluded. Furthermore, Officer McHenry, Officer Eli Hass, and Captain Read all testified that they generally muted and/or turned off their body cameras around Detective Don Hass because he did not like the use of body cameras.

In addition to officers turning off the microphones at various points during the investigation, there is a point where Detective Don Hass is seen turning off Officer Eli Hass's[3] body camera footage. *See* Def. Ex. 1. In the minutes preceding this, Patrick Dunlap can be seen on Officer Eli Hass's body camera going into the living room and sitting on his couch as he attempted to tell his story of what happened that evening. While he was talking, Officer Eli Hass stood in the doorway of the living room and asked him to hold off on telling his story and to come back outside. Patrick Dunlap eventually returned outside, and Detective Don Hass stood with Officer Eli Hass in the kitchen, which is located between the door leading outside and the living room, and asked, "What was this

---

[3] Detective Don Hass, who has since retired, is Officer Eli Hass's father.

guy doing in here?" then followed that question with, "Was anybody else in the crime scene?" Officer Eli Hass responded "No," then laughed. Almost immediately thereafter, Detective Don Hass turned off Officer Eli Hass's body camera. *Id.* Officer Eli Hass later turned his body camera back on to inventory the Defendant's vehicle, *see* Def. Ex. 2, and other officers' cameras were on and recording as they moved around the scene. Gov't Ex. 1 & Def. Exs. 1-4.

## Analysis

Two motions filed by the Defendant are now before the undersigned Magistrate Judge. First, the Defendant has moved for a *Jackson v. Denno* hearing and to suppress statements she made that were recorded on the body camera, asserting that her confession was involuntary due to intoxication. Second, the Defendant requested a taint hearing for purposes of dismissing the indictment, or alternatively suppressing evidence. At the November 15, 2021 suppression hearing, however, the Defendant conceded that she is not requesting that the body camera footage be suppressed, and that dismissal of the indictment is unlikely. Rather, she has requested a jury instruction that the Officers' actions deviated from the standard of care, providing an inference that evidence not available would have been favorable to the Defendant. For the reasons set forth below, the undersigned Magistrate Judge finds that both of the Defendant's motions should be denied as to the relief requested.

As to the Defendant's first motion regarding the voluntariness of her statements, the undersigned Magistrate Judge notes first that the Defendant was clearly not in custody at

the time of her statements. The Defendant seems to assert that her intoxication level was so high that her statements could not be considered voluntary at the time she made them.[4] However, in order to find a Defendant's statements were an involuntary confession, there must also be a finding of "coercive police action." *United States v. Minard*, 208 Fed. Appx. 657, 660 (10th Cir. 2006) (citations omitted). Here, there was, in essence, no police action at all. Officer McHenry arrived on the scene and the Defendant made a spontaneous statement. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by" the *Miranda* holding. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Moreover, the Fifth Amendment "does [not] protect a defendant from h[er] own compulsions or internally-applied pressures which are not the product of police action." *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993). This includes intoxication. *See, e. g.*, *Cardenas v. Hartley*, 448 Fed. Appx. 826, 828 (10th Cir. 2011) ("Mr. Cardenas called the police and confessed of his own volition [after being

---

[4] The undersigned Magistrate Judge notes that the Defendant called Ms. Rebecca Miller, a Registered Nurse and Nurse Practitioner, to testify at the suppression hearing as an expert with regard to the Defendant's intoxication. The Defendant attempted to put on her testimony for the purpose of asserting that the Defendant had been given some sort of narcotic similar to a "date rape" drug, although she was unable to identify who administered this unknown drug to the Defendant or at what point in the evening it occurred. Ms. Miller testified that she has never been qualified as an expert for such purposes but has previously been qualified as an expert as a SANE nurse, to testify as to exams she had personally conducted. The undersigned Magistrate Judge allowed her testimony to proceed, but declined to find she was an expert, particularly with regard to toxicology or pharmacology. Furthermore, the Government has now filed a Motion in Limine requesting that Ms. Miller's testimony be excluded from trial and stricken as to the suppression hearing held on November 15, 2021. *See* Docket No. 71. That motion is not before the undersigned Magistrate Judge. Out of an abundance of caution in light of the concerns raised as to Ms. Miller's qualifications, the undersigned Magistrate Judge has declined to rely on Ms. Miller's testimony as to the Defendant's intoxication in consideration of this motion.

*Mirandized*]. Further, merely because Mr. Cardenas was intoxicated and distraught does not undermine the voluntariness determination based upon the totality of the circumstances.") (internal citations omitted); *United States v. Muniz,* 1 F.3d 1018, 1022 (10th Cir. 1993) ("The state of intoxication does not automatically render a statement involuntary. The test is whether the person's will was overcome, or whether the statement was freely made."). Indeed, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

In any event, the undersigned Magistrate Judge is cognizant that "the exclusionary rule is designed to deter [Government] misconduct." *United States v. Leon*, 468 U.S. 897, 916 (1984). *See also Utah v. Strieff*, _ U.S. _, 136 S. Ct. 2056, 2063 (2016) ("The exclusionary rule exists to deter police misconduct."). Because suppression here would fail "to yield appreciable deterrence," *Davis v. United States*, 564 U.S. 229, 237 (2011) (quotation omitted), it is not appropriate here. *Id.* at 236-237 ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations."). Accordingly, the undersigned Magistrate Judge has no difficulty concluding that the Defendant's statement was not given in a custodial context and the confession therefore did not implicate her constitutional rights. The undersigned Magistrate Judge therefore finds that any statements made by the Defendant, seen on body camera footage and prior to the time she was placed in custody, should not be suppressed.

The undersigned Magistrate Judge turns next to the Defendant's second referred motion. The Defendant contends that law enforcement officers committed investigative errors and allowed the evidence to be contaminated and/or was not collected at all in the course of the investigation of this incident. As such, the Defendant asserted in her motion that these due process errors are sufficiently grievous to warrant dismissal of the indictment or suppression of evidence. As noted above, however, the Defendant conceded at the suppression hearing that she was not requesting suppression of the video evidence in this case, as she planned to make use of it at trial. Defendant's Counsel indicated that she is now seeking either a dismissal of the indictment or an adverse jury instruction, although he conceded at the hearing that even dismissal was unlikely.

To establish a due process violation, the Supreme Court has held that a plaintiff must show that the evidence at issue "possess an exculpatory value that was apparent," and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Where the evidence is not "apparent" but only potentially useful, however, the Supreme Court has instructed that the Defendant must show bad faith on the part of law enforcement officers. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). The Tenth Circuit has further clarified that in order "[t]o establish that the Government deprived h[er] of due process by destroying potentially exculpatory evidence [under *Youngblood*], [the Defendant] must

show both that 1) the evidence destroyed was potentially exculpatory and 2) the government acted in bad faith in destroying it." *United States v. Beckstead*, 500 F.3d 1154, 1158 (10th Cir. 2007). *See also United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) ("[I]f the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence.") (*quoting Youngblood,* 488 U.S. at 58).

Here, the video evidence was not immediately evident as exculpatory but Plaintiff *has* established that it was potentially useful evidence, and therefore the *Youngblood* analysis applies. For example, based on body camera footage recovered and submitted last week for the first time, she pointed out there is some discrepancy between a statement Detective Don Hass wrote on behalf of Mr. Kenieutubbe which Mr. Kenieutubbe then signed, and body camera footage, as to whether Mr. Kenieutubbe saw the gun in the Defendant's hand after Mr. Jameson was shot. *See* Def. Hr'g Exs. 4, 6. This supports a finding that there may have been potentially useful information in the portions of the videos where the microphones and/or body cameras were turned off, as well as in the collection practices. The remaining question, then, is whether the officers were acting in bad faith in turning off their microphones and/or videos, and in collecting evidence at the scene.

The Tenth Circuit "consider[s] five factors when determining whether the government destroyed or lost evidence in bad faith: (1) whether the government was on notice of the potentially exculpatory value of the evidence; (2) whether the potential

exculpatory value of the evidence was based on more than mere speculation or conjecture; (3) whether the government had possession or the ability to control the disposition of the evidence at the time it learned of the potential exculpatory value; (4) whether the evidence was central to the government's case; and (5) whether there's an innocent explanation for the government's failure to preserve the evidence." *United States v. Ray*, 899 F.3d 852, 864-865 (10th Cir. 2018) (*citing Bohl*, 25 F.3d at 911-913).  The undersigned Magistrate Judge will address this question separately for the body camera evidence and the collection of evidence at the scene, although the conclusion is the same for both questions.

As to the body camera evidence, the undersigned Magistrate Judge finds as to the first four factors that the Government was not on notice that the footage would be potentially exculpatory, other than the general use of body cameras as capturing what happened in real time.  *Compare with Bohl*, 25 F.3d at 911 ("[W]e note first that the government was explicitly placed on notice that Bell and Bohl believed the tower legs were potentially exculpatory.").  Furthermore, the potential exculpatory value of the body camera footage—both the footage where the microphones were turned off and where the entire system was turned off—is based on speculation.  And while the Government has had control of the footage, the footage is not central to the Government's case and in some instances is available from another officer's recording during the same time.

As to the fifth factor, the undersigned Magistrate Judge looks at whether there is an innocent explanation for the Government's failure to preserve this footage properly.  The undersigned Magistrate Judge agrees that the officers' actions in relation to the operation

of their body cameras were likely at least partially made in violation of McAlester Police Department Policy[5] and inadvisable. But while courts have generally agreed that a failure to follow department body camera policies "deprived the Court from reviewing the best evidence available," *United States v. Gibson*, 366 F. Supp. 3d 14, 26-27 (D.D.C. 2018), violations of police department body camera policy have generally been found insufficient to establish bad faith. *See, e. g.*, *United States v. Brown*, 2017 WL 8941247, at *15-16 (D. Nev. Aug. 14, 2017) ("The Court agrees that Metro Officers Lebario, Roberts, and Rodriguez did not activate or re-activate their BWCs in strict accordance with Metro policies and procedures. Even so, this is more indicative of negligence than bad faith. The Court has thoroughly reviewed the footage from the BWCs and testimony from the evidentiary hearing, and finds that the Government's conduct does not rise to the level of bad faith. "Official animus" or a "conscious effort to suppress exculpatory evidence" are lacking here. . . . At most, the record reflects negligence in failing to turn on the BWCs. And negligence is not enough. Brown has failed to cite a single case where a Court has found bad faith from the failure of law enforcement to record certain events with their BWCs. Having failed to demonstrate either the materiality of the evidence or any bad faith on the part of the Government, Brown cannot make out a due process violation based on

---

[5] The McAlester Police Department "Personal Recording Devices Policy #15-10" (effective May 26, 2015) regarding police personnel wearing personal recording devices ("PRD") states that, "Once initiated, the PRD recording should not be terminated until the event is compete with the exception that the recorder may be deactivated during a prolonged investigation or traffic control. In the event the PRD is deactivated, the officer will articulate the reason on the recording and in any related incidents." Docket No. 37, Ex. 1, p. 3. However, the policy also states, "The PRD shall not generally be used to record [c]ommunication with other police personnel without the permission of the Chief of Police." *Id.*, p. 4.

the failure to collect BWC footage at certain junctures of Metro's encounter with Brown."). The undersigned Magistrate Judge further notes that the officers' actions with regard to the microphone and video footage were not specific to this case, *i. e.*, Officers McHenry, Eli Hass, and Read all testified at the suppression hearing that Detective Don Hass did not like body cameras in general and they would turn their microphones off when he was around, and there was further testimony that officers had a common practice of turning off body camera microphones when speaking to each other. While their actions, again, may have been violations under the departmental policy and inadvisable as a matter of course, such testimony does tend to support a finding that the officers' actions were not based in animus or bad faith *directed at the Defendant. Cf. United States v. Parker*, 72 F.3d 1444, 1452 (10th Cir. 1995) ("Defendants' contentions that Trooper Bushnell knew his patrol car video camera would inadvertently switch on occasionally and that with that knowledge he should not have left the video tape in the camera on December 17th, at most establish that Trooper Bushnell was negligent in preserving the video taped evidence. Mere negligence is not sufficient to establish that Trooper Bushnell acted in bad faith."). Based on the record here, the undersigned Magistrate Judge therefore finds that the Defendant has not met her burden of establishing either that the body camera footage was constitutionally material or the officers' bad faith conduct.

    Although not thoroughly developed, the Defendant further seems to assert that the officers failed to properly collect evidence at the scene, including failing to sequester the witnesses and letting them back into the scene, as well as failing to collect sufficient

evidence at the scene and failing to properly preserve and test evidence. But "[t]he argument that the mere fact that the Government did not collect the evidence shows bad faith is untenable." *Brown*, 2017 WL 8941247, at *15. In applying the above-listed five factors and assuming *arguendo* that the evidence is potentially useful, the Defendant's claim of bad faith is nevertheless not based on anything more than speculation or conjecture. While the Government was in control of the evidence, the Defendant has made no showing that any of the alleged evidence (destroyed or not collected at all) is central to the Government's case. At best, the Defendant has alleged negligence or incompleteness, which is insufficient to establish bad faith under the circumstances. *See Riggs v. Williams*, 87 Fed. Appx. 103, 106 (10th Cir. 2004) ("The evidence also established that the police returned the shoes to Clark after the state crime lab either failed to test the shoes or never received the shoes for testing. This evidence is insufficient to establish a due process violation under *Youngblood*. To begin with, petitioner has offered no legal authority to support his claim that the police had a duty to test the shoes, and *Youngblood* supports the opposite conclusion. Further, while the police may have failed to preserve the shoes, there is no evidence in the record to support petitioner's claim that the shoes were returned to Clark as part of a bad faith attempt by the police to destroy their potential exculpatory value.") (citation omitted). *See also United States v. Taylor*, 312 F. Supp. 3d 170, 179 (D.D.C. 2018) ("It is possible that in an extraordinary case a court might infer bad faith from an officer's failure to collect obviously material evidence. But here, the importance of the evidence Taylor now seeks was not so obvious as to suggest that the failure to gather

and to preserve it was itself indicative of bad faith.  Taken together, the rock against which Taylor's claim founders is the Supreme Court's clear admonition that neither negligence nor incompleteness violates the Due Process Clause.") (citations omitted).

Because the Defendant has not established bad faith on the part of the law enforcement officers in this case, she is not entitled to dismissal of the indictment.  Nor is she entitled to an adverse inference instruction, because "the Tenth Circuit has held that in the absence of bad faith, the court cannot impose a dispositive sanction or give an adverse inference instruction at trial."  *Oto Software, Inc. v. Highwall Techs., LLC*, 2010 WL 3842434, at *14 (D. Colo. Aug. 6, 2010.  Accordingly, her motion to dismiss the indictment or alternatively suppress evidence should be denied.

## Conclusion

In sum, the undersigned hereby PROPOSES the findings set forth above and RECOMMENDS that the Motion for *Jackson-Denno* Hearing [Docket No. 30] be GRANTED to the extent the undersigned Magistrate Judge held a *Jackson v. Denno* hearing, but otherwise DENIED and that the Defendant's Motion Conduct Taint Hearing and Dismiss Indictment or in the Alternative Suppress Testimony of Law Enforcement and Collected Evidence [Docket No. 37] is GRANTED to the extent the undersigned Magistrate Judge held a taint hearing as to the evidence in this case but otherwise DENIED.  Any objections to this Report and Recommendation must be filed within fourteen (14) days.

IT IS SO ORDERED this 19th day of November, 2021.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**